**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **The State Bank of Geneva, as Administrator of the Estate of Andrew T. Freund, Jr., deceased,** )<br>)<br>)<br>) | |
| **Plaintiff,** )<br>) | |
| **v.** )<br>) | **Case Number:** |
| **Carlos Acosta** )<br>**and** ) | **Jury Trial Demanded** |
| **Andrew R. Polovin,** )<br>) | |
| **Defendants.** )<br>)<br>) | |

**COMPLAINT**

NOW COMES the Plaintiff, the State Bank of Geneva, as Administrator of the Estate of Andrew T. Freund, Jr., deceased, by and through its attorneys, Meyers and Flowers, LLC, and for its complaint against Defendants Carlos Acosta and Andrew R. Polovin alleges and states as follows:

**PARTIES TO THE ACTION**

1. At the time of his death on April 15, 2019, Andrew T. Freund, Jr. ("AJ") was a resident of McHenry County, Illinois.

2. The Plaintiff, the State Bank of Geneva, is the acting Administrator of the Estate of Andrew T. Freund, Jr., deceased, pursuant to its appointment by the Circuit Court of the Twenty-Second Judicial Circuit, in case number 19PR179.

3. At all times relevant hereto, Defendant Carlos Acosta ("Acosta") was a Child Protection Advanced Specialist employed by the Department of Children and Family Services ("DCFS"). Defendant Acosta is a resident of McHenry County Illinois.

4.      At all times relevant hereto, Defendant Andrew R. Polovin ("Polovin") was a Child Protection Supervisor employed by DCFS.   Defendant Polovin is a resident of McHenry County Illinois.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

## SUMMARY OF CLAIM

7.      It is a fundamental right of all US citizens to enjoy their life, liberty and property free from governmental infringement unless due process is first provided.

8.      While parents have a fundamental right to direct the upbringing of a child, this right is not absolute and is subordinate to their child's inalienable right to not be removed from a safe environment and placed into one in which it is clear that harm is likely to occur.

9.      Recognizing that minor children are typically unable to assert and protect their constitutional rights, Illinois, like every other state, has enacted laws which empower state actors to take and retain custody of minors who are endangered by their parents' abuse and neglect.

10.      The prime directive of the Illinois Abused and Neglected Child Reporting Act ("ANCRA"; 325 ILCS 5/1, et seq)  mandates that the "Illinois Department of Children and Family Services shall, upon receiving reports made under this Act, protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect,

2

offer protective services in order to prevent any further harm to the child and to other children in the same environment or family…" (the "Prime Directive").

11.     To accomplish ANCRA's Prime Directive, Illinois empowers law enforcement personnel, physicians and DCFS investigators to take protective custody of endangered children, *sua sponte*, so that such children remain safe from their suspected abusers until a thorough investigation into the allegations of abuse can be completed.

12.     In furtherance of ANCRA's Prime Directive, DCFS adopted comprehensive procedures ("DCFS Procedures") that govern its investigations, and which require, as a further safeguard, that each investigation be overseen by a Child Protection Supervisor.

13.     AJ entered this world on October 14, 2013 suffering from opioid dependency, an addiction inflicted upon him by his parents' reckless lifestyle.  AJ was quickly removed from his parents' custody but was returned to his parents' care in 2015.  In 2017 and 2018, police officers, medical personnel and AJ's neighbors made numerous calls to DCFS' Child Abuse Hotline ("Hotline Calls"), detailing not only AJ's observable physical injuries, but also the appalling condition of his home at 94 Dole Avenue, Crystal Lake, Illinois which he shared with his younger brother Parker.

14.     Inexplicably and contrary to DCFS Procedures, only two of the numerous 2017-2018 Hotline Calls were documented and investigated by DCFS, namely a Hotline Call made on March 18, 2018 (the "March Hotline Call") and a Hotline Call made on December 18, 2018 (the "December Hotline Call").

15.     In response to the two Hotline Calls that DCFS deigned to document, the assigned DCFS Child Protection Specialists conducted sham investigations and filed reports which included falsified findings intended to justify their determinations that the allegations of abuse were "Unfounded".

3

16.     Defendant Polovin was the DCFS Child Protection Supervisor who oversaw the investigations into the March and December Hotline Calls; but rather than acting as a failsafe, he ignored the patent deficiencies and obvious prevarications that littered the investigators' reports and blessed his subordinates' findings that the allegations of AJ's abuse were "Unfounded".

17.     If Defendant Polovin had followed ANCRA's Prime Directive and DCFS Procedures, the allegations of abuse set forth in the March Hotline Call would have been found to be "Indicated", resulting in either AJ being placed in protective custody, or at the very least, a family safety plan being implemented and monitored by DCFS.

18.     The December Hotline Call was initiated by a Crystal Lake police officer who found AJ and his younger brother Parker living in squalid conditions and, after observing a large bruise on AJ's hip that extended down his thigh, exercised the power granted police officers under ANCRA and placed AJ and his younger brother Parker under protective custody.

19.     Defendant Acosta, a DCFS Child Protection Advanced Specialist, was assigned to investigate the December Hotline Call and, upon his arrival at the Crystal Lake police station, assumed protective custody over AJ and Parker on behalf of DCFS.

20.     Under ANCRA, in order to allow sufficient time for its Child Protection Specialists to conduct their initial investigation, protective custody over endangered children may be maintained for up to 48 hours before a court hearing is necessary to establish temporary custody.

21.     Although AJ told Defendant Acosta that the bruise was caused by a dog, the police officer who made the Hotline Call told Acosta that the large bruise was not consistent with a dog pawing a child and that AJ's mother's statement that she was unaware of AJ's enormous bruise was wholly incredible.

22.     Despite the police officer's conviction that AJ's bruise evidenced child abuse, within an hour after his arrival at the police station, Defendant Acosta, after consulting with his

4

supervisor Defendant Polovin, released AJ and his brother Parker from protective custody, returned custody to their mother, and directed her to drive AJ to the hospital so that an emergency room doctor could opine on whether the bruise might have been caused by a dog.

23.     Despite AJ's mother's coaching on the way to the hospital, AJ, while alone with the emergency room doctor, admitted that the bruise was caused by his mother striking him with a belt. The doctor relayed this information to Defendant Acosta.

24.     Within 24 hours after an investigator first sees the alleged victim, DCFS Procedures require that its Child Protection Specialists complete a Child Endangerment Risk Assessment Protocol (a "CERAP"). The CERAP includes a list of potential "safety threats" and if the investigator checks any box indicating the presence of a potential safety threat, the CERAP is marked "unsafe" and the investigator and the supervisor must decide whether further actions are necessary, including taking protective custody or implementing a "safety plan".

25.     Defendant Acosta falsified the CERAP and indicated that AJ's bruise was caused by a dog and that no safety threats endangered AJ which would warrant taking AJ into protective custody or even warrant the establishment of a family safety plan which would allow DCFS to monitor the situation.

26.     After the Crystal Lake police department rescued AJ from his abusers and placed him in protective custody, Defendants Acosta and Polovin, ignoring DCFS Procedures and the Prime Directive of ANCRA, returned AJ right back into the claws of his abusers, who were further emboldened by the Defendants' indifference to gear up their infliction of horrific physical and mental abuse and torture, culminating in AJ's murder on April 15, 2019.

27.     A special relationship existed between AJ and the Defendants arising from ANCRA's Prime Directive that abused children be kept in protective custody until a proper investigation into allegations of abuse are conducted so that at-risk children are not returned to an unsafe environment.

28.     In light of AJ's vulnerability and the serious nature and credibility of the reports of abuse, the Defendants' reckless and abject failure to keep AJ in protective custody until a proper investigation was completed demonstrates an inhumane indifference to AJ's safety and shocks the conscience.

29.     In contemptuous disregard of AJ's safety and well-being, the Defendants' reckless actions and inactions deprived AJ of his life and liberty, including his right not be removed from a safe environment and placed into one in which it is clear that harm is likely to occur, guaranteed under the Fourteenth Amendment in violation of the Civil Rights Act of 1871 (42 U.S.C. § 1983).

## DETAILED ALLEGATIONS

30.     On or about June 7, 2012, DCFS had its first interaction with AJ's mother, triggered by a report received via DCFS's child abuse hotline (a "Hotline Call"), alleging that AJ's older brother Austin, only eleven at the time, was unsupervised, underfed and generally neglected. Despite the fact that Austin was living in squalid conditions, DCFS determined that the report was "Unfounded" and closed the investigation.

31.     On or about December 24, 2012, another Hotline Call was received which alleged that AJ's mother was abusing prescription drugs, neglecting Austin, and maintaining a home in such a deplorable state that endangered Austin's safety.  Again, DCFS determined the Hotline Call "Unfounded" and closed the investigation.

32.     On January 13, 2013, Austin's grandmother, painfully aware of the danger that her daughter, as well as her live-in boyfriend Andrew Freund, Sr, posed to Austin, filed a petition to obtain permanent custody of Austin, citing the following conditions, amongst others, to support her claim: (1) that Austin often observed his mother and her boyfriend abusing drugs; (2) that while under the influence of drugs, Austin's mother drove a car with Austin as a passenger; (3) that Austin's home was unsanitary and unsafe, and littered with dog feces and dirty dishes; (4) that Austin did not receive regular meals, and that the meals he received often consisted of only marshmallows and water; (5) that Andrew Freund, Sr. would frequently walk around the house carrying a loaded gun; and (6) that Austin lived in constant fear, filth, and hunger when in the care of his mother and her boyfriend.

33.     In October 2013, after an evidentiary hearing, Austin's grandmother was awarded permanent custody of Austin.

34.     When AJ was born on October 14, 2013, he tested positive for having opiates and benzodiazepines in his system, and the hospital reported the abuse to DCFS. After a DCFS investigation confirmed the abuse, the State's Attorney opened an abuse and neglect case against AJ's parents and AJ was placed into the loving home of his cousin.

35.     Nearly two years later, after DCFS determined that AJ's parents had stopped abusing drugs and could provide a suitable environment to raise a child, the juvenile court ordered AJ to be returned to his parents at their home at 94 Dole Ave, Crystal Lake, Illinois (the "Dole House").

36.     DCFS conducted follow up visits with AJ's parents until April of 2016 at which time DCFS closed its abuse and neglect case, restoring full custodial rights to AJ's parents.

37.     In 2017, in order to prevent the intervention of relatives, AJ's parents forbid AJ's grandmother and AJ's brother Austin from having any further contact with AJ and Parker. AJ's

parents also banned AJ's cousin, the foster parent who raised AJ for the first eighteen months of his life, from having any further contact with AJ.

38.     Sometime in 2017, AJ's parents reverted to their destructive drug-addicted lifestyle and DCFS began receiving Hotline Calls which reported that the children were neglected and subjected to deplorable living conditions at the Dole House.

39.     On or around October 31, 2017, a neighbor to the Dole House reported that AJ and his brother came to her house for trick-or-treating.   When she answered the door, the neighbor assumed that AJ was dressed in a Mummy costume, however, AJ's mother informed her that AJ had accidently spilled boiling water on his head and face.  Unconvinced by this explanation, the neighbor reported this incident to DCFS via a Hotline Call.  The neighbor also states that she subsequently made numerous other Hotline Calls concerning the deplorable conditions that she observed at the Dole House which were unfit for a child to live in.

40.     On August 22, 2019, the Circuit Court of McHenry County ordered that a Citation to Discover Information be issued against DCFS (the "DCFS Discovery Citation") directing that DCFS produce to the Plaintiff unredacted copies of all documents in its possession related to AJ. None of the documents produced by DCFS references the October 2017 Halloween incident or any other reports of abuse the neighbor claims to have made to DCFS.

41.     On March 21, 2018, AJ's mother was found passed out in a car as a result of a drug overdose and was taken to the emergency room at Centegra Memorial Hospital in Woodstock, Illinois ("Centegra Hospital").

42.     Later that day, AJ's father, accompanied by AJ and his younger brother Parker who were dressed in their clothes inside out, came to Centegra Hospital to retrieve the keys to the car that AJ's mother had been found in.

43. On March 21, 2018, a medical professional at Centegra Hospital made a Hotline Call (the "March Hotline Call") based upon her observation that AJ had odd bruising on his face and forehead and that both AJ and his brother Parker were dirty and appeared neglected.

44. The medical professional who made the March Hotline Call is a mandatory reporter under Section 4 of the Illinois Abused and Neglected Child Reporting Act (325 ILCS 5/1).

45. Based on the seriousness of the reporter's allegations, the March Hotline Call was assigned the category of: "60-Substantial Risk of Physical Injury/Environmental Injurious to Health and Welfare by Neglect" (a "Code 60 Report").

46. Under DCFS' Procedures Guidebook, a Code 60 Report requires that a Child Protection Specialist meet with the alleged victim within 24 hours after the Hotline Call is received.

47. The investigation into the March Hotline Call was assigned to Kathleen Gold, a DCFS Child Protection Specialist ("Gold").

48. Consistent with the mandates of ANCRA, DCFS Procedures required that its Child Protection Specialists, including Gold, conduct thorough investigations into credible allegations of child abuse. These procedures include the following directives (the "DCFS Investigative Directives"):

A. That the investigation be initiated by in-person contact with the alleged child victim or victims within 24 hours of the receipt of the report, or by a good faith attempt to contact the alleged child victim or victims (DCFS Procedures-Section 300-50).

B. That when reports of abuse concern children under the age of six, such as AJ, who are vulnerable and at great risk of suffering serious injuries and harm, it is imperative that diligent efforts are made to review and synthesize all the information available to make comprehensive decisions to ensure child safety (DCFS Procedures-Section 300-90).

C. That when reports of abuse concern a child who has suffered parental abuse in the past, such as AJ who suffered neonatal abstinence syndrome at birth due to his mother's drug abuse, the investigation should be screened with the local State's Attorney (DCFS Procedures-Section 300-90).

D. That the Child Protection Specialist should conduct a scene investigation documenting the vicinity and surroundings where an incident of child abuse or neglect is alleged to have occurred… and that the investigator determine whether there are environmental factors (e.g., exposed wiring, unusable sinks or toilets, feces, garbage, lack of food, dirty dishes, bugs, rodents, broken glass) in the child's home or other location where the child was found that affect safety and risk to the child or children (DCFS Procedures-Section 300-60).

E. That the Child Protection Specialist establish a timeline describing what happened at least 24 to 48 hours immediately preceding the injury or incident of abuse or neglect. Timelines are essential to determining how an injury or incident occurred (DCFS Procedures-Section 300-60).

F. That the Child Protection Specialist determine and document whether the child disclosed how he was injured (DCFS Procedures-Section 300-60).

G. That the Child Protection Specialist interview, observe, and thoroughly assess every alleged child victim and any other child subjects individually and outside of the presence of the alleged or potential abuser (DCFS Procedures-Section 300-50).

H. That the Child Protection Specialist observe the home environment and complete the CFS 2027, Home Safety Checklist (DCFS Procedures-Section 300-50).

I.   That a child's information is more credible when the child is interviewed out of the presence of others who have the ability and motivation to coerce, coach or otherwise influence the child's statement (DCFS Procedures-Section 300-50).

49.   In her report of her investigation of the March Hotline Call ("Gold's Report"), Gold indicates she first attempted to make contact with AJ on March 22, 2018, by going to a home in McHenry, Illinois, whose occupant told Gold that the Freunds did not live there.

50.   It is inexplicable that Gold was not aware that AJ resided in Crystal Lake at the Dole House when in fact his parents had resided there since 2012 and Gold indicated that on March 22 she spoke with Jamie Mower, the DCFS caseworker who handled AJ's original infant drug exposure case, who informed Gold that, after AJ was returned to his parents care in 2015, she had performed well-being checks on AJ at the Dole House over the next ten months.

51.   In Gold's Report, Gold also acknowledges that DCFS caseworker Mower informed her that both of AJ's parents had an extensive history of drug abuse.

52.   In her report, Gold documents March 29, 2018 as her next attempt to meet with the Freund's, this time at the Dole House, and notes: "Good Faith Attempt to meet with entire family at 94 Dole Crystal Lake White two-story home with green trim.  no answer left card."

53.   On April 9, 2018, Gold's Report documents her next attempt to contact the Freund's, this time by phone, noting: "Unable to leave a message on phone."

54.   On April 25, 2018, Gold documents that she finally made contact with AJ's father by text and notes that he texted back that "JoAnn will be home with the boys between 12:30 and 1:00"; and then later that "JoAnn will not be home until 2:00pm".

55.   At 2:00PM on April 25, 2018, Gold briefly met with AJ's mother outside of the Dole House.  Gold observed AJ and his brother playing outside in the driveway, but she did not conduct an interview outside of the presence of their mother with either of the boys, nor does

Gold's Report explain why she did not insist viewing the inside of the home to determine if the children were living in a safe environment.

56.     On May 9, 2018, Gold texted AJ's father and told him that an appointment with the entire family needs to be set up at their Crystal Lake home no later than May 17; and on May 15, AJ's father set up the appointment for May 17.

57.     On May 17, 2018, Gold finally met with AJ, Parker and their parents inside the Dole House.   In her report, Gold states that the "house appeared clean, neat and adequately furnished. The house appeared in good repair both inside and outside.  All utilities were working. Home appeared to be hazard free."

58.     On May 17, Gold conducted a private interview with AJ's father who denied "any substance abuse treatment or DUIs and denied being arrested, police involvement or domestic violence."

59.     Gold's inexplicable delay in making physical contact with the children for over a month after DCFS received the March Hotline Call allowed the odd bruising on AJ's face and forehead to heal prior to her brief meeting with the boys on April 24, 2018.

60.     There is no indication in Gold's Report that she ever conducted an interview of AJ or Parker outside the presence of her parents.

61.     There is no indication in Gold's Report that she ever investigated the odd facial bruising reported in the March Hotline Call.

62.     By scheduling her home visits at the convenience of AJ's suspected abusers, Gold allowed AJ's parents time to stage their home to hide the dangerous environmental conditions that the children normally endured.

63.      By conducting her investigation on the terms of AJ's abusers, the protections that would be afforded AJ under DCFS' Procedures were nullified.

64. Under Section 7.14 of ANCRA (325 ILCS 5/7.14), Child Protection Specialists are required to classify the resolution of their investigation into one of three categories: "Indicated", "Unfounded" or "Undetermined", as the case may be.

65. Under Section 8.1 of ANCRA (325 ILCS 5/8.1), a finding that the allegations of abuse are "Unfounded" can only be made if the Child Protection Specialist "determines after investigating a report that there is no credible evidence that a child is abused or neglected."

66. Under DCFS Procedures, the primary duties and responsibilities of a Child Protection Supervisor, such as Defendant Polovin, include:

> A. Providing guidance and direction for all investigations of alleged child abuse and neglect by planning, supervising, reviewing and coordinating the activities of the Child Protection Specialists under their supervision;
>
> B. Ensuring that all investigations are conducted within the existing framework of statutes and policies of the Department and that all investigative contacts, activities and documentation are completed within the allotted timeframes;
>
> C. Providing regular and on-going supervision to the Child Protection Specialist;
>
> D. Ultimately, ensuring that all children reported to the Department are safe. (DCFS Procedures-Section 300-90).

67. On May 18, 2018, Gold, after ignoring nearly all DCFS Investigative Directives and conducting what at best might be deemed a sham investigation into the March Hotline Call, concluded that the allegations of abuse were "Unfounded".

13

68.     Pursuant to DCFS Procedures, Gold was required to meet and confer with her supervisor, Defendant Polovin, before she could issue her final investigative findings and close her investigation into the March Hotline Call.

69.     As a Child Protection Supervisor, Defendant Polovin was tasked to carefully supervise and review Gold's work to ensure that she had performed the investigation in conformance with DCFS Procedures, and thereby, carry out ANCRA's mandate to protect children from their abusers.

70.     On May 18, 2018, Defendant Polovin, in reckless disregard of his duties to ensure that DCFS Procedures and investigative protocols are followed, blessed Gold's sham investigation and authorized Gold to conclude that the allegations of abuse reported in the March Hotline Call were "Unfounded".

71.     When Defendant Polovin legitimized Gold's wholly deficient investigation and her finding that the allegations of abuse were "Unfounded" rather than "Unresolved" or "Indicated", Defendant Polovin knew that the danger to AJ would be increased as any investigator of a future Hotline Call would presume that the allegations of the March Hotline Call were baseless.

72.     As required by DCFS Procedures, AJ's parents were informed that the investigation into the March Hotline Call had been concluded and that the allegations of abuse were determined to be "Unfounded".

73.     On August 5, 2018, AJ's parents called the Crystal Lake police to the Dole House and reported that someone stole their opioid prescription drugs.  The officers noted in their report that AJ's parents appeared to be on narcotics and that false reporting of the loss of prescription drugs, as a ruse to obtain a replacement prescription, was a common ploy of drug abusers to get their opioid prescriptions refilled prematurely.

14

74.     On September 20, 2018, the Crystal Lake Police Department received a report from a citizen who was concerned about the well-being of AJ and Parker due to the fact that the children were living in deplorable conditions and that the utilities to the Dole House had been shut off. Officer Dennis Meyer responded to the call.  AJ's mother answered the door but did not let Officer Meyer into the house.  She admitted that the living conditions were poor and that the power had been off for a while but claimed that she was looking for a new place to live.  AJ's mother refused to allow Officer Meyer to enter and inspect the home.

75.     Immediately following his visit to the Dole House, Officer Meyer made a Hotline Call on September 20, 2018 (the "September Hotline Call") and reported the allegations of environmental neglect set forth in the citizen's complaint as supported by his own observations and noted that he was unable to view much of the interior of the home due to the refusal of AJ's mother to allow him entry.

76.     In the police report contemporaneously filed in regard to the incident, Officer Meyer indicates that DCFS personnel informed him that DCFS normally does not investigate power outages, but that a DCFS investigator would contact him shortly.

77.     Officer Meyer never heard back from anyone at DCFS in regard to his September Hotline Call.

78.     None of the documents produced by DCFS in response to the DCFS Discovery Citation makes any reference of an investigation into Officer Meyer's September Hotline Call--in fact, the records produced by DCFS do not even reference that the September Hotline Call had ever been made.

79.     At approximately 7:50AM on December 18, 2018, the Crystal Lake Police Department received a call from AJ's mother, which she made from a parking lot at the Taco Bell

15

at 420 W Virginia Street, Crystal Lake, who claimed that her live-in lover Daniel Nowicki ("Nowicki") had stolen her opioid medications.

80.　Within minutes, Officer Kimberly Shipbaugh met with AJ's mother at the Taco Bell parking lot and noticed two young children in the backseat of her car, one of whom was visibly upset.　Officer Shipbaugh directed AJ's mother to drive the children back to their home and that she would follow them in her squad car.

81.　At 8:30AM, Officer Nickolaus Trimpe located Nowicki walking in a commercial area of Crystal Lake.　Nowicki denied stealing AJ's mother's opioids but claimed that they had gotten into an argument that morning because AJ's mother had stolen his opioid medications and that he left the house because she had gotten belligerent and started shouting at him in front of the children.

82.　Officer Trimpe joined Officer Shipbaugh at the Dole House to continue their investigation of AJ's mother's complaint that Nowicki had stolen her prescription pain medications.

83.　Upon their arrival at the Dole House, Officers Shipbaugh and Trimpe were appalled that the children were living in deplorable conditions, specifically detailing in their report the following observations: (1) dog feces and urine were scattered about the residence; (2) several windows of the residence, including AJ's bedroom, were broken which allowed cold outside air to enter the residence; (3) that despite the broken windows and freezing conditions, AJ was dressed in only a diaper; (4) a fireplace that appeared to be the main heat source was broken; (5) filth, clutter, dirt, and disrepair was evident throughout the home; (6) there was jagged and broken flooring in the kitchen; (7) there was water damage to the kitchen ceiling, causing it to partially collapse; (8) the furniture was covered in piles of dirty clothing; (9) the door to the kitchen was

16

covered by unknown brown substances; and, (10) although AJ's bedroom window was open, an overwhelming smell of feces permeated the room.

84.     Appalled and concerned about the children's well-being, Officer Trimpe documented their observations by taking pictures of the deplorable living conditions.

85.     As AJ was only wearing a pull-up diaper, the officers noticed a large bruise that extended from AJ's right hip onto his thigh.  When questioned about the bruising, AJ's mother's first response was that "she had not noticed it before".  After looking at the bruise as if for the first time, AJ's mother stated, "that it must have been from the dog."

86.     Neither Officer Trimpe nor Officer Shipbaugh believed that the large bruise was consistent with an interaction with a dog and believed that AJ was a victim of child abuse.

87.     Deeply concerned for the welfare of AJ and his younger brother Parker, pursuant to the power granted police officers under ANCRA, Officer Shipbaugh took the children into protective custody and brought them to the Crystal Lake Police Station.

88.     AJ's mother was placed under arrest for driving while her license was suspended, and she also was also transported to the Crystal Lake Police Station.

89.      Officer Shipbaugh details in her report of the incident that she interviewed AJ's mother at the police station and that she once again stated that "she had no idea where it [the bruise] came from."  Further, damaging her credibility, AJ's mother told Officer Shipbaugh that she could not remember when she had put the pull-up diaper on AJ.

90.     As required by law, Officer Shipbaugh immediately made a Hotline Call to DCFS (the "December Hotline Call") detailing her concern that AJ had been a victim of both direct physical abuse and environmental neglect and that pursuant to ANCRA's Prime Directive she had placed the children into protective custody.

17

91.     Based on the seriousness of the reporter's allegations, the DCFS intake specialist who received the December Hotline Call categorized the report as: "11-Cuts Bruises Welts Abrasions and Oral Injuries" ("Category 11 Report") as well as "82-Environmental Neglect".

92.     According to DCFS Procedures, a Category 11 Report of abuse means:

> … that the parent, caregiver immediate family member, other person residing in the home, or the parent's paramour has created a REAL AND SIGNIFICANT DANGER of physical injury which would likely cause disfigurement, death or impairment of physical health or loss or impairment of bodily functions. (DCFS Procedures-Appendix B).

93.     The December Hotline Call was further classified by DCFS as an emergency requiring the immediate response of a DCFS investigator.

94.     Defendant Acosta was dispatched to the Crystal Lake police station and arrived there at 9:30AM.  Upon his arrival, Defendant Acosta assumed protective custody of the children on behalf of DCFS.

95.     Upon assuming protective custody, Defendants Acosta and Polovin assumed a special relationship with AJ to carry out ANCRA's Prime Directive that children removed from an abusive situation must not be returned to their alleged abusers unless and until a thorough investigation determines that it is safe to do so.

96.     Before abdicating its protective custody over AJ, Defendants Acosta and Polovin were obligated to follow DCFS' Procedures and thoroughly investigate the serious allegations of physical abuse and environmental neglect set forth in the December Hotline Call.

97.     Like Gold, Defendants Acosta and Polovin were obligated to abide by DCFS Investigative Directives in its investigation of the allegations of AJ's abuse and neglect.

98. DCFS Procedures proscribes a succinct protocol on how the initial investigation of a Category 11 Report of abuse is to be conducted, which include the following mandatory steps, which cannot be waived absent the documented approval of the Child Specialist Supervisor assigned to oversee the investigation (the "Initial Investigation Steps"):

A. Data check, LEADS check, and Soundex of household members and other subjects regularly frequenting or living in the home.

B. Thoroughly read and review prior investigations.

C. Interview reporter, source and OPWI identified in the current report or related information.

D. In person, individual interview with alleged child victim(s) and completion of CERAP.

E. In person or phone interview with law enforcement, if police have had contact on current report. This contact is to help establish the need to move to formal investigation phase.

F. In person, individual interview with parent/caretakers. Parents should be contacted on the same day as contact with child victim(s) if at all possible. If CERAP is marked unsafe, parents must be interviewed immediately to ensure the child's safety, and the formal investigation must be commenced.

G. Interview alleged perpetrator either in person or by phone.

H. Investigation into household members substance abuse.

99. There is no documented reference in the DCFS records that Defendant Polovin issued a waiver to Defendant Acosta which would have allowed Defendant Acosta to ignore the required Initial Investigative Steps and, in light of the seriousness of the allegations, there would have been no justification for the issuance of such a waiver.

19

100.    Despite the serious nature of the December Hotline Call, Defendant Acosta failed to follow all of the Initial Investigative Steps before recommending to Defendant Polovin that he approve the release of AJ from the safety of protective custody.

101.    In his report detailing his investigation into the December Hotline Call ("Acosta's Report"), Acosta documented that the reporter, Officer Shipbaugh, told him that she did not believe the large bruise on AJ's right hip and thigh were consistent with contact with a dog.

102.    Despite the concern of Officer Shipbaugh, Acosta conducted cursory interviews with AJ and his brother Parker.  First, Acosta interviewed Parker while AJ was in the room.  In Acosta's Report, Acosta states that Parker "would lean over a chair and hide his face.  After several attempts, worker discontinued his efforts."

103.    Acosta's Report indicates that he next interviewed AJ alone, and summarized his interaction as follows:

> He stated that, last night, he and Parker were watching Polar Express on the couch.  "Lucy," their Boxer was on the couch with them.  Worker observed (and photographed) a large bruise on Andrew's right side and asked how Andrew got the bruise on his side.  He stated that "Lucy put her paw on me."  He denied that he or Parker were playing with or otherwise engaging Lucy.  He tried to tell mom last night, but she was busy.

104.    Acosta then interviewed AJ's mother.  The summary of that interview as set forth in Acosta's Report reveals that: (1) Acosta never probed into the source of AJ's large bruise; (2) Acosta never questioned how AJ's mother could be ignorant of such a large and patently obvious bruise until the police officers brought it to her attention; (3) AJ's mother claimed to have been living with Nowicki until the previous Saturday—the same person who she claimed had stolen her prescription medications; and, (4) despite the revelation that AJ's mother claimed that she just

20

moved back into the home after breaking up with Nowicki--Acosta never questioned AJ's mother about Nowicki, or why she was exposing the children to a notorious drug addict.

105.    Further, Acosta never bothered to resolve the inconsistency between the story that AJ's mother told Officer Trimpe—that Nowicki was living in the Dole House with her, but had left the home after a fight that morning, with the story that AJ's mother told Acosta—that she had been living with Nowicki but that they had separated and that he did not live with her now.

106.    Nor did Acosta bother to interview Nowicki, who Officer Trimpe had interviewed earlier that morning, to get his perspective as to the cause of AJ's bruising, the dangerous environment at the Dole House or even details of what transpired that morning when AJ's mother became belligerent and shouting in front of the children.

107.    Incredibly, despite Officer's Shipbaugh's concerns, the obvious discrepancies  in AJ mother's stories, Parker's refusal to talk and the implausibility that such a large bruise could be caused by a dog pawing a child on a couch, Acosta released AJ and Parker from protective custody and back into their mother's care and instructed her to take AJ to the emergency room for an exam to determine whether AJ's injury might have been caused by a large breed dog.

108.    Defendant Acosta released AJ from DCFS' protective custody despite the fact that he failed to complete the Initial Investigation Steps required in response to a Category 11 report of abuse.

109.    AJ and his mother arrived at Centegra Hospital at about 2:00PM on December 18, 2018.

110.    In Centegra Hospital's records, a nurse's note indicates that as part of the hospital's intake protocol, AJ was in interviewed outside the presence of his mother and that AJ "had positive responses to the questions(s) Have you ever been hurt by someone taking care of you?"

111. Dr JoEllen Channon, an emergency room physician, examined AJ at 2:40PM. In her notes, she indicated that AJ had suffered abrasions to his upper lip and right hip. When questioned in the presence of his mother, AJ told Dr. Channon that his dog caused the injuries when they were playing; however, when Dr. Channon met with AJ privately, Dr. Channon documented that AJ reluctantly revealed that his injury occurred because his mother had hit him with a belt, but that she didn't mean to hurt him. As the doctor pressed for more information, AJ returned to his story that the bruise was caused by the dog, but then offered a new explanation that he had fallen while getting a juice box.

112. In her notes, Dr. Channon references that she spoke with Defendant Acosta by phone at 4:30PM and relayed to him that AJ had told her that his mother had hit him with a belt and that AJ changed his story multiple times. Dr. Channon expressed concern to Acosta that AJ was the victim of abuse from his mother or another family member, but that she was not qualified to opine on the cause of AJ's injury and that Acosta should arrange for AJ to meet with a professional trained to evaluate child abuse.

113. In his report, Acosta admits that Dr. Channon told him that she had no idea of what caused AJ's injuries because she was neither a forensic specialist nor a child abuse specialist.

114. Section 300-100(c)(4) of DCFS Procedures provides that, "A second medical opinion is required when . . . the treating physician is unable or unwilling to offer an opinion regarding the cause of the injury."

115. Despite Dr. Channon's inability to offer an opinion on the cause of AJ's injuries, Acosta ignored DCFS' mandate that AJ be examined by a physician qualified to provide an opinion on whether AJ's contusions were evidence of child abuse.

116.    Further, Acosta's Report reveals that Dr. Channon relayed her concern that AJ was a victim of child abuse and that AJ had told her when she was alone with him, that "maybe someone hit me with a belt.  Maybe mommy didn't mean to hurt me."

117.    Despite Dr. Channon's concerns and her suggestion that a qualified child abuse investigator be summoned to meet with AJ, Acosta instructed personnel at Centegra Hospital to release AJ and his brother Parker to their father and that the family, including AJ's mother, could return to the Dole House.

118.    Incredibly, shortly after he began his investigation, Acosta released AJ and Parker from DCFS' protective custody and allowed their patently drug-addicted parents to take the children back to their deplorable home environment—filled with feces, collapsed ceilings, missing flooring, all of which the Crystal Lake Police had documented with photographs earlier that day.

119.    On December 19, 2018, Defendant Acosta went to Dole House and concluded it was a suitable environment for AJ and his brother.  However, Acosta's Report fails to reference let alone reconcile his alleged observations with the deplorable conditions photographed by the Crystal Lake Police the day before which depicted living conditions unfit for a dog.

120.    As part of DCFS Initial Investigative Steps, Defendant Acosta was required to complete a Child Endangerment Risk Assessment Protocol (a "CERAP").  The CERAP includes a list of potential "safety threats" and if the investigator checks any box indicating the presence of a potential safety threat, the CERAP is marked "unsafe" and the investigator and the supervisor must decide whether further actions are necessary, such as taking protective custody or implementing a "safety plan."

121.    On December 20, 2018, Defendant Acosta falsely certified the CERAP by finding that AJ faced no safety threats if he was returned to the Dole House, summarizing his "Safety Decision" as follows:

> The child or children are currently safe.  Andrew was found to have a large bruise on his right trunk, which he states as caused by his dog (a large boxer breed). Medical exam was inconclusive.  RE Dr. stated it "could have been a dog or a belt or a football."  Home was found by CLPD to be cluttered and have animal urine present.  Worker visited the home the next day and found the sleeping areas appropriate.  Dining and living rooms were cluttered with clothes and toys, but no clear safety concerns or hazards observed.

122.    Despite the horrid and unsanitary living conditions, despite AJ reporting to the doctor that his mother had physically abused him, despite the documented history of environmental neglect by the mother and father, and despite the availability of numerous police reports confirming that AJ's parents had resumed abusing drugs, Defendant Acosta determined the allegations of abuse and neglect reported in the December Hotline Call to be "Unfounded" and closed the investigation on January 4, 2019.

123.    Pursuant to DCFS Procedures, Defendant Acosta was required to meet and confer with his supervisor, Defendant Polovin, before he could issue his final investigative findings and close his investigation into the December Hotline Call.

124.    As a Child Protection Supervisor, Defendant Polovin was tasked to carefully supervise and review Defendant Acosta's work to ensure that he had performed the investigation in conformance with DCFS Procedures, and thereby, carry out ANCRA's mandate to protect children from their abusers.

125.    On January 4, 2019, Defendant Polovin, a DCFS Public Service Administrator who at all relevant times acted as Defendant Acosta's supervisor, in reckless disregard of his duties to ensure that DCFS' investigative child protection protocols are followed, blessed Defendant Acosta's sham investigation and concurred in his finding that the December Hotline Call of abuse to be "Unfounded".

126.    As required by DCFS Procedures, AJ's parents were notified that the investigation into the December Hotline Call had been concluded and that the allegations of abuse were determined to be "Unfounded".

127.    On or about April 18, 2019, the Crystal Lake Police Department responded to a missing person's report filed by AJ's parents.  Upon their arrival at the Dole House, the police reported observing the same deplorable living conditions that they relayed to DCFS in their September Hotline Report and in their December Hotline Report.

128.    After conducting a forensic analysis of AJ's parents' cellphones, the Crystal Lake Police discovered a horrific video, timestamped March 4, 2019, in which AJ is seen laying on a bare mattress in his bedroom, while his mother is verbally berating him for wetting his bed.  In the video, AJ is naked except for bandages on his wrists and hips; and deep bruising can be seen around his eyes, neck and upper chest.

129.    Following the discovery of the video, AJ's father admitted that he and AJ's mother would frequently, as "forms of discipline": (i) inflict severe beatings upon AJ; (ii) imprison AJ in his bedroom at night or during the day for hours at a time; and, (iii) force AJ to take 20-minute freezing cold showers.

130.    AJ's father told investigators that AJ died as a result of a cold shower punishment, however, the subsequent autopsy of AJ's body revealed that he most likely died on April 15, 2019 due to multiple blunt force injuries to the head.

25

## COUNT I—VIOLATION OF CIVIL RIGHTS ACT, 42 USC § 1983

### *(Survival Action-Defendant Acosta)*

131.    Plaintiff re-alleges the preceding paragraphs contained in the Complaint, as if fully set forth herein.

132.    The Fourteenth Amendment to the United States Constitution guarantees that States will not "deprive any person of life, liberty, or property without the due process of law" and protects those fundamental rights and liberties that are implicit in the concept of ordered liberty such that sacrifice of them would prevent the existence of liberty or justice.

133.    At all times relevant hereto, Defendant Acosta was aware that his failure to follow the mandates established by ANCRA as implemented through DCFS Procedures endangered AJ's life, liberty and well-being.

134.    As a Child Protection Advanced Specialist, it was Defendant Acosta's duty to properly and thoroughly investigate credible reports of physical or emotional abuse of a child as well as credible reports that a child was living in an unhealthy or otherwise dangerous home environment.

135.    At all times relevant hereto, Defendant Acosta knew that the failure of a DCFS Child Protection Advanced Specialist to properly and thoroughly investigate credible reports that a child was in danger could in fact increase the danger to the child.

136.    Consciously violating every investigative protocol, Defendant Acosta prematurely released AJ from protective custody and returned him to the deranged whims of his drug-addicted parents.

137.    Consciously violating every investigative protocol, Defendant Acosta concluded that the bruises on AJ's body were the product of an enthusiastic family dog and not, as AJ had divulged, caused by a belt wielded by his own mother.

138.    Consciously violating every investigative protocol, Defendant Acosta released AJ from protective custody and back into his abuser's care and allowed her to drive him to Centegra Hospital which gave her the opportunity to further coerce AJ into fabricating the cause of his injuries.

139.    Consciously violating every investigative protocol, Defendant Acosta essentially adopted an irrebuttable presumption that AJ's injuries were caused by a dog because Dr. Channon, who admittedly was not qualified to render an opinion on the issue, could not opine that AJ's bruises were not caused by a dog.

140.    Consciously violating every investigative protocol, Defendant Acosta failed to schedule an examination of AJ by a medical professional trained to observe and interview victims of child abuse despite Dr. Channon's admission that she was not qualified to do so.

141.    Consciously violating every investigative protocol, Defendant Acosta found the allegations of abuse set forth in the December Hotline Call as "Unfounded", which under ANCRA meant that Acosta determined that there was no credible evidence that AJ had been abused or neglected.

142.    In reckless disregard to AJ's safety and well-being, Defendant Acosta falsified the CERAP and indicated that AJ's home environment was safe and suitable for young children, contrary to the direct observations and photographs taken by the Crystal Lake police officers the day before.

143.     Defendant Acosta's decision to close the investigation into the December Hotline Call with a finding that the allegations of abuse were "Unfounded" had a chilling effect as reporters, convinced that their messages would be ignored, quit making Hotline Calls.

144.     Emboldened by Defendant Acosta's conscious indifference to AJ's safety, AJ's parents increased the intensity and frequency of their beatings and torture, relishing in their barbarism to the point of producing a video of their handiwork timestamped March 4, 2019, and ultimately, leading to AJ's murder on April 15, 2019.

145.     Defendant Acosta, acting under color of state law, deprived Plaintiff of rights, privileges, and immunities secured by the Constitution and laws of the United States, including those secured by the Fourteenth Amendment, by, among other things, conducting his investigation of credible reports of abuse with malicious indifference, by falsely reporting that he had conducted a proper investigation, and by falsely reporting that he had observed AJ's home environment to be suitable for a child.

146.     As a result of Defendant Acosta's reckless conduct, willful fabrications and callous disregard for AJ's rights secured by the Constitution and laws of the United States, on December 18, 2018, DCFS released AJ from protective custody and abandoned him to deranged drug addicted abusers who subjected AJ to innumerable beatings, home imprisonments and torture, causing AJ unimaginable physical and mental torment and pain.

147.     But for Defendant Acosta's failure to follow mandated DCFS Procedures, AJ would not have been released from DCFS protective custody in December 2018, and would not have been returned to his parents where he incurred further abuse and was eventually killed. Rather, AJ would have been placed back with his loving cousin or another family member or foster home and remained safe from the torments of his deranged parents.

28

WHEREFORE, the Plaintiff prays for judgment against Defendant Carlos Acosta and for compensatory damages for the pain and suffering endured by AJ after his release from protective custody on December 18, 2018 until his death on April 15, 2019, in an amount deemed just and proper, and for reasonable attorney's fees.

## COUNT II—VIOLATION OF CIVIL RIGHTS ACT, 42 USC § 1983

### *(Wrongful Death Action-Defendant Acosta)*

148.     Plaintiff re-alleges the preceding paragraphs contained in the Complaint, as if fully set forth herein.

149.     On April 15, 2019, and for some time prior thereto, there was in full force and effect in the State of Illinois a certain Act, commonly known as the Wrongful Death Act, 740 ILCS 180/1-2, inclusive, which provided in pertinent part as follows:

> Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured and although the death shall have been caused under such circumstances as amount in law to felony.  (740 ILCS 180/1)

> Every such action shall be brought by and in the names of the personal representatives of such deceased person, and, except as otherwise hereinafter provided, the amount recovered in every such action shall be for the exclusive

benefit of the surviving spouse and next of kin of such deceased person and in

every such action the jury may give such damages as they shall deem a fair and

just compensation with reference to the pecuniary injures resulting from such

death, to the surviving spouse and next of kin of such deceased person.  (740

ILCS 180/2).

150.    As a result of Defendant Acosta's reckless conduct, willful fabrications and callous

disregard for AJ's rights secured by the Constitution and laws of the United States, on December

18, 2018, DCFS released AJ from protective custody and abandoned him to deranged drug

addicted abusers who subjected AJ to innumerable beatings, home imprisonments and torture,

causing AJ unimaginable physical and mental torment and pain before he was beaten to death on

April 15, 2019.

151.    But for Defendant Acosta's failure to follow mandated DCFS Procedures, AJ

would have been placed back with his loving cousin and remained safe from the torments of his

deranged parents.

152.    AJ's heirs under Illinois law are his parents, Andrew Freund, Sr. and Joann

Cunningham, and three siblings, two of whom are minors.

153.    AJ's parents will be disqualified from receiving anything from AJ's estate or any

other benefits arising from his death due to the application of Section 2-6 of the Illinois Probate

Act, often referred to as the "Slayer Statute", which provides as follows:

Person causing death. A person who intentionally and unjustifiably causes the death of

another shall not receive any property, benefit, or other interest by reason of the death,

whether as heir, legatee, beneficiary, joint tenant, survivor, appointee or in any other

capacity and whether the property, benefit, or other interest passes pursuant to any form of

title registration, testamentary or nontestamentary instrument, intestacy, renunciation, or

any other circumstance. The property, benefit, or other interest shall pass as if the person causing the death died before the decedent, provided that with respect to joint tenancy property the interest possessed prior to the death by the person causing the death shall not be diminished by the application of this Section. A determination under this Section may be made by any court of competent jurisdiction separate and apart from any criminal proceeding arising from the death, provided that no such civil proceeding shall proceed to trial nor shall the person be required to submit to discovery in such civil proceeding until such time as any criminal proceeding has been finally determined by the trial court or, in the event no criminal charge has been brought, prior to one year after the date of death. A person convicted of first-degree murder or second-degree murder of the decedent is conclusively presumed to have caused the death intentionally and unjustifiably for purposes of this Section.

154.    AJ's siblings have suffered substantial pecuniary losses as a result of their brother's death, including, but not limited to, loss of society, companionship, guidance, attention, training, instruction, grief, sorrow, and all other damages allowed pursuant to the Illinois Wrongful Death Act (740 ILCS 180/1) as a result of the acts and/or omissions of the Defendant Acosta that caused AJ's death.

WHEREFORE, the Plaintiff prays for judgment against Defendant Carlos Acosta and that a judgment for damages be against Defendant, pursuant to the provisions of the Illinois Wrongful Death Act, in an amount deemed just and proper, and for reasonable attorney's fees.

## COUNT III—VIOLATION OF CIVIL RIGHTS ACT, 42 USC § 1983

### *(Survival Action-Defendant Polovin)*

31

155. Plaintiff re-alleges the preceding paragraphs contained in the Complaint, as if fully set forth herein.

156. Under DCFS Procedures, Child Protection Supervisors, including Defendant Polovin, were required to provide guidance and consultation to Child Protection Specialists for all critical decisions.

157. At all times relevant hereto, Defendant Polovin was aware that his failure, as well as the failure of DCFS Child Protection Specialists that he supervised, to follow DCFS Procedures endangered AJ's safety.

158. As a Child Protection Supervisor, Defendant Polovin had the power to set the tone for his office and provide the discipline to ensure that Child Protection Specialists under his supervision performed their duties in accordance with the mandate established by ANCRA as implemented through DCFS Procedures.

159. At all times relevant hereto, Defendant Polovin knew that his failure to carry out his responsibility to ensure that Child Protection Specialists did their job endangered at-risk children, such as AJ, in violation of ANCRA's prime directive—"ultimately, ensuring that all children reported to the Department are safe" (DCFS Procedures-Section 300-90).

160. As a Child Protection Supervisor, it was Defendant Polovin's duty to properly supervise Gold and Defendant Acosta, and to ensure that they conducted proper investigations into the serious allegations of abuse reported in the March and December Hotline Calls.

161. At all times relevant hereto, Defendant Polovin knew that the failure of a DCFS Child Protection Advanced Specialist to thoroughly investigate credible reports that a child was in danger could in fact increase the danger to the child.

162. At all relevant times, Defendant Polovin knew that authorizing one of the Child Protection Specialists under his supervision to falsely conclude that a report of abuse was

"Unfounded" not only endangers the child by failing act in response to the then reported abuse, but also compromises future investigations into later reports of abuse, further endangering the child.

163.    Consciously violating his duties as a Child Protection Supervisor, Defendant Polovin failed nearly all of his responsibilities with respect to his supervision of Gold's investigation into the March Hotline Call.

164.    In Defendant Acosta's Report of his investigation of the December Hotline Call, he confirms that he relied on Gold's determination that the allegations of abuse in the March Hotline Report were "Unfounded".

165.    Defendant Acosta relied on Gold's finding that the March Hotline Call allegations were "Unfounded" due to the fact that Defendant Polovin was required to: (i) first confirm that Gold's investigation complied with DCFS Procedures; and, (ii) that Gold would not have been able to conclude the allegations of abuse were "Unfounded" unless Defendant Polovin had authorized Gold to do so.

166.    Consciously violating his duties as a Child Protection Supervisor, Defendant Polovin failed nearly all of his responsibilities with respect to his involvement with Defendant Acosta's investigation into the December Hotline Call.

167.    At all times relevant hereto, Defendant Polovin knew that the failure of a DCFS Child Protection Specialist to properly and thoroughly investigate credible reports that a child was in danger could in fact increase the danger to the child.

168.    Defendant Polovin knew when Defendant Acosta requested approval to terminate protective custody over AJ that Defendant Acosta had failed to initiate, let alone complete, the DCFS Initial Investigative Steps required when serious allegations of abuse are reported; but

despite this knowledge, Defendant Polovin authorized the termination of DCFS' protective custody.

169.    Despite Defendant Polovin's knowledge that Defendant Acosta had violated nearly every DCFS investigative protocol, Defendant Polovin authorized Defendant Acosta to prematurely release AJ from protective custody and return him to the deranged whims of his drug-addicted parents.

170.    Consciously violating every investigative protocol, Defendant Acosta concluded that the bruises on AJ's body were the product of an enthusiastic family dog and not, as AJ had divulged, caused by a belt wielded by his own mother.

171.    Defendant Polovin's decision to close the investigation into the December Hotline Call with a finding that the allegations of abuse were "Unfounded" had a chilling effect as reporters, convinced that their messages would be ignored, quit making Hotline Calls.

172.    Emboldened by Defendant Polovin's conscious indifference to AJ's safety, AJ's parents increased the intensity and frequency of their beatings and torture, relishing in their barbarism to the point of producing a video of their handiwork timestamped March 4, 2019, and ultimately, leading to AJ's murder on April 15, 2019.

173.    Defendant Polovin, acting under color of state law, deprived Plaintiff of rights, privileges, and immunities secured by the Constitution and laws of the United States, including those secured by the Fourteenth Amendment, by, among other things: (i) allowing Gold and Defendant Acosta to conduct sham investigations; (2) allowing Gold and Defendant Acosta to certify that allegations of AJ's abuse were "Unfounded"; (3) allowing Gold and Defendant Acosta and Gold to falsely report that they had conducted proper investigations; (4) allowing Hotline Calls of abuse to be undocumented; (5) allowing Hotline Calls to be ignored and not investigated; and,

(6) by promoting a workplace culture where Child Protection Specialists routinely failed to carry out proper investigations into abuse allegations.

174.    As a result of Defendant Polovin's reckless conduct, willful fabrications and callous disregard for AJ's rights secured by the Constitution and laws of the United States, on December 18, 2018, DCFS released AJ from protective custody and abandoned him to deranged drug addicted abusers who subjected AJ to innumerable beatings, home imprisonments and torture, causing AJ unimaginable physical and mental torment and pain.

175.    But for Defendant Polovin's failure to follow mandated DCFS Procedures, AJ would not have been released from DCFS protective custody in December 2018, and would not have been returned to his parents where he incurred further abuse and was eventually killed. Rather, AJ would have been placed back with his loving cousin or another family member or foster home and remained safe from the torments of his deranged parents.

WHEREFORE, the Plaintiff prays for judgment against Defendant Andrew R. Polovin and for compensatory damages for the pain and suffering endured by AJ after his release from protective custody on December 18, 2018 until his death on April 15, 2019, in an amount deemed just and proper, and for reasonable attorney's fees.

## COUNT IV—VIOLATION OF CIVIL RIGHTS ACT, 42 USC § 1983

### *(Wrongful Death Action-Defendant Polovin)*

176.    Plaintiff re-alleges the preceding paragraphs contained in the Complaint, as if fully set forth herein.

177.    As a result of Defendant Polovin's reckless conduct, willful fabrications and callous disregard for AJ's rights secured by the Constitution and laws of the United States, on December 18, 2018, DCFS released AJ from protective custody and abandoned him to deranged drug

addicted abusers who subjected AJ to innumerable beatings, home imprisonments and torture, causing AJ unimaginable physical and mental torment and pain before he was beaten to death on April 15, 2019.

178.    But for Defendant Polovin's failure to follow mandated DCFS Procedures, AJ would have been placed back with his loving cousin and remained safe from the torments of his deranged parents.

179.    AJ's siblings have suffered substantial pecuniary losses as a result of their brother's death, including, but not limited to, loss of society, companionship, guidance, attention, training, instruction, grief, sorrow, and all other damages allowed pursuant to the Illinois Wrongful Death Act (740 ILCS 180/1) as a result of the acts and/or omissions of the Defendant Polvin that caused AJ's death.

WHEREFORE, the Plaintiff prays for judgment against Defendant Andrew R. Polovin and that a judgment for damages be against Defendant, pursuant to the provisions of the Illinois Wrongful Death Act, in an amount deemed just and proper, and for reasonable attorney's fees.

Date: October 16, 2019

> Respectfully submitted,
>
> **State Bank of Geneva, as Administrator of the Estate of Andrew Freund, Jr., Deceased**
>
>
> /s/ *Peter J. Flowers*
> One of the Attorneys for Plaintiff

Peter J. Flowers, Esq. (#6210847)
Meyers & Flowers, LLC
225 West Wacker Dr., Suite 1515
Chicago, IL 60606
(630) 232-6333
(630) 845-8982 (FAX)